*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF COLUMBIA*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CASE NO.: 1:16-cr-188-RJL |
| JAMES E. CARTWRIGHT | |

## <u>SENTENCING MEMORANDUM ON BEHALF OF JAMES E. CARTWRIGHT</u>

Gregory B. Craig
Clifford M. Sloan
Brendan B. Gants
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

## TABLE OF CONTENTS

APPENDIX OF EXHIBITS ........................................................................................................i

I.      INTRODUCTORY STATEMENT ...........................................................................1

II.     THE OFFENSE ........................................................................................................4

III.    RELATED CONDUCT ............................................................................................6

IV.     THE SENTENCE ...................................................................................................11

V.      GENERAL CARTWRIGHT'S PERSONAL BACKGROUND AND
        MILITARY RECORD ...........................................................................................16

VI.     LETTERS OF SUPPORT ......................................................................................18

VII.    CONCLUSION ......................................................................................................20

# APPENDIX OF EXHIBITS

Submission of Leonard Downie Jr., Professor of Journalism and Former Executive Editor of the *Washington Post* — Exhibit 1

Submission of James L. Jones, Former National Security Advisor, Former Commander of European Central Command and Supreme Allied Commander Europe, 32nd Commandant of the Marine Corps — Exhibit 2

Letter from David Sanger, National Security Correspondent for the *New York Times* — Exhibit 3

Letter from Daniel Klaidman, Former Special Correspondent for *Newsweek* (filed under seal) — Exhibit 4

Joint Letter from Current and Former Senior Government Officials — Exhibit 5
- Deputy Secretary of State Antony Blinken
- Former Deputy Secretary of State William Burns
- Former Deputy Secretary of Defense Rudy DeLeon
- Former Under Secretary of Defense Michele Flournoy
- Former Deputy Secretary of Defense John Hamre
- Former National Security Advisor James Jones
- Former Deputy Secretary of Defense William Lynn
- Former Deputy Secretary of State James Steinberg

Letters from Congressional Leaders — Exhibit 6
- Senator Dianne Feinstein of California
- Former Senator Sam Nunn of Georgia
- Former Representative Jane Harman from California
- Former Representative  and Under Secretary of State Ellen Tauscher

Letters from Current and Former Government Officials — Exhibit 7
- Chief Master Sergeant Fred Allen
- Former Assistant Secretary of Defense Graham Allison, founding Dean of Harvard's Kennedy School of Government
- Former Secretary of Defense Harold Brown
- Former J6 Staff Member Angela F. Bruce
- Lieutenant General Charlie E. Croom, Former Director of Defense Information Systems Agency and Commander of Joint Task Force Global Network Operations
- Rear Admiral Jane G. Dalton, Former Counsel to Joint Chiefs of Staff
- Mary Clark Forbes, Former Deputy Division Chief for Command, Control, Communications, Computers and

Intelligence
- Former Marine Corps Captain Frederick Graefe
- Former National Security Advisor Stephen J. Hadley
- Former Air Force Officer David Max Korzen
- Former Under Secretary of the Treasury Stuart A. Levey
- Former Director of National Geospatial-Intelligence Agency Letitia A. Long
- Secretary of the Navy Ray Mabus
- Brigadier General Richard Scott Stapp, Former Director of Department of Defense Special Access Program Central Office
- Former Senior Counselor to the Secretary of the Department of Homeland Security Scott Lewis Weber

Letters from Interested Individuals                                              Exhibit 8
- Robert E. Beauchamp, Chairman and CEO of BMC Software, director of Raytheon
- Susan Eisenhower, Chairman and CEO of Eisenhower Group
- Mary L. Howell, CEO of Howell Strategy Group, director of Atlantic Council
- Thomas A. Kennedy, Chairman and CEO of Raytheon
- David McAllister-Wilson, President of Wesley Theological Seminary
- Ronald L. Skates, former director of Raytheon
- William R. Spivey, director of Raytheon

Official White House Photograph of May 2013 Meeting with                        Exhibit 9
President Obama, Vice President Biden, General Cartwright, and
Others

## I.    INTRODUCTORY STATEMENT

On Friday, November 2, 2012, General James E. Cartwright made false statements to federal investigators during the course of an interview.  Confronted with evidence of that misconduct, he acknowledged his mistake.  When the interview resumed the following business day (Monday, November 5, 2012), he corrected the record.  General Cartwright understands the magnitude of his offense and deeply regrets the decision that he made on November 2, 2012.  He has accepted responsibility and acknowledged his guilt.  On October 17, 2016, General Cartwright entered a plea of guilty to violating 18 U.S.C. § 1001.

With deepest respect for the rule of law -- and without minimizing his misconduct -- General Cartwright submits this Sentencing Memorandum in support of his request for a non-custodial sentence.  In fashioning a sentence sufficient to achieve the purposes of punishment, General Cartwright urges the Court to consider the following facts:

(1)  General Cartwright's entire life has been dedicated to serving his country.  That life of service has been distinguished by exceptional public achievement.  It is not enough to say that General Cartwright's service has been exemplary.  As a result of his leadership in the military and his work for two Presidents, wars have been avoided and lives have been saved.  That history emerges from the 20-page Presentence Report that details General Cartwright's personal history and military record.  It can also be seen in the letters that have been submitted to this Court from leaders of the nation's security establishment and from co-workers, colleagues and citizens who know him and have worked with him.  They are unanimous in their support for a probationary sentence not only because of his past public service but also because of his potential to contribute in the future.

(2)  In his contacts and communications with American journalists, General Cartwright was motivated by a desire to save secrets, not to disclose them.  It is true that General Cartwright discussed classified information with individuals not authorized to receive such information.  General Cartwright acknowledges that he engaged in such communications with David Sanger of the *New York Times* and with Daniel Klaidman then of *Newsweek* magazine.  Those communications, however, took place as part of -- and in the context of -- General Cartwright's good-faith effort to eliminate details in the reporting of these journalists that, if published, could put U.S. lives in jeopardy and endanger national security interests.

Letters from Messrs. Sanger and Klaidman provide important context:

- *First*, both journalists contacted General Cartwright -- he did not initiate contact with them.  *See* Ex. 3 (Sanger letter), p. 1; Ex. 4 (Klaidman letter) (under seal), p. 2.

- *Second*, both journalists conducted almost all of their pertinent research before they contacted General Cartwright in the communications at issue.  As Mr. Sanger explains, "I had spoken to many sources in the United States, Israel, Europe, and elsewhere prior to speaking to Gen. Cartwright, and I already had a detailed understanding of the chain of events."  Ex. 3, p. 1; *see also* Ex. 4, pp. 1-2.

- *Third*, General Cartwright understood that both journalists had engaged in discussions with the White House in advance of their discussions with him.  In his letter, Mr. Sanger relates that the White House "advised [him] to reach out to Gen. Cartwright for an interview."  Ex. 3, p. 1.  Mr. Sanger related the same to General Cartwright directly, and Mr. Klaidman in his emails with General

Cartwright also explicitly invoked previous communications with the White House.

- *Fourth*, and perhaps most significantly for the current context, in General Cartwright's communications with both journalists, he successfully persuaded them not to report information that would be harmful to the United States. As Mr. Sanger summarizes, General Cartwright "expressed concerns that certain classified information not be revealed. His cautions weighed heavily in decisions that I made, in consultation with editors, about what information to withhold from publication." Ex. 3, p. 2; *see also* Ex. 4, p. 2 (based on General Cartwright's request and reasoning, Mr. Klaidman did not include certain content in his public reporting). As Mr. Sanger emphasizes, "Throughout the interview, [General Cartwright] consistently showed his concern that information damaging to U.S. interests not be made public. . . . I have no doubt he was trying to act in the best interests of the United States." Ex. 3, p. 2.

In sum, in his contacts with Messrs. Sanger and Klaidman, General Cartwright was engaged in a "save-the-secrets" exercise, a practice that is well-established and well-understood in Washington, D.C. It provides senior officials in the national security establishment an opportunity to persuade journalists to modify their reporting on the most sensitive topics of national security interest to avoid harm to the nation -- exactly what General Cartwright did here.

(3) A sentence of incarceration in this case is not needed to achieve the purposes of punishment or to serve the interests of justice. *See* 18 U.S.C. § 3553(a). Such a sentence is not justified either by the circumstances of the offense or by the history and character of the defendant. General Cartwright has already paid a high price for his mistake and been damaged

almost beyond measure.  To sentence General Cartwright to jail -- to add incarceration to the

injury and humiliation that he has already suffered -- would result in gross sentencing disparities

when compared with comparable cases.  The applicable Sentencing Guidelines range includes a

probationary sentence without incarceration, and thus such a sentence would be fully consistent

with the applicable Guidelines range.  A sentence of probation with community service is

appropriate and available in this case.  We urge the Court to follow that path.

## II.     THE OFFENSE

General Cartwright's offense is described in the one-count Information and Statement of

Offense filed with the Court on October 17, 2016.  General Cartwright does not dispute the

factual basis for the offense as set forth in those documents.

On Friday, November 2, 2012, two agents from the FBI and an Assistant U.S. Attorney

for the District of Maryland interviewed General Cartwright.  General Cartwright knew that this

interview was part of a highly publicized investigation of certain leaks of classified information

to reporters.  The investigation had been prompted by, among other things, speeches from

lawmakers on the floor of the Senate and the House accusing the Obama White House of

impropriety, *i.e.*, of having engaged in the selective leaking of classified information for political

advantage during the ongoing presidential campaign.  *See, e.g.*, *Rep. King:  Obama Using Leaks

to Build Image, Trying to be Like 'John Wayne,'* FoxNews.com (June 10, 2012),

http://www.foxnews.com/politics/2012/06/10/rep-king-leaks-came-from-white-house-obama-

trying-to-be-like-john-wayne.html. Rather than appoint an independent prosecutor, Attorney

General Eric Holder assigned Maryland U.S. Attorney Rod Rosenstein as one of two prosecutors

to investigate the alleged leaks.  *See* Josh Gerstein, *Holder Names Leak Probe Prosecutors*,

Politico (June 8, 2012, 7:39 PM), http://www.politico.com/story/2012/06/holder-names-leak-

probe-prosecutors-077228.

When the FBI asked to talk to General Cartwright, he agreed to meet with the agents. He did not consult a lawyer and was not represented by counsel when the interview began on Friday, November 2, 2016. He knew that he had not been a source for any of these news reports, he was confident that he had engaged in no wrongdoing, and he believed that he faced no legal jeopardy.

During the interview on November 2, General Cartwright acknowledged meeting with David Sanger of the *New York Times* but stated that he did not discuss classified information with him. That statement was false. The agents handed General Cartwright a typewritten list of quotes taken from Mr. Sanger's book. Some of the quotes contained classified information. Others did not. General Cartwright denied making any of the statements on that list to Sanger. General Cartwright acknowledges that this statement was also untrue.

The agents asked General Cartwright if he had ever discussed a certain country in the Middle East in discussions with Daniel Klaidman of *Newsweek* magazine. General Cartwright denied ever discussing that country with Mr. Klaidman. General Cartwright acknowledges that this statement was also untrue.

On Sunday, November 4, 2012, General Cartwright communicated with the agents and agreed to resume the interview on the following day, Monday, November 5, 2012. At no time during the time period Friday, November 2 -- when the interview began -- through Monday November 5, 2012 -- when the interview resumed and was concluded -- was General Cartwright represented by counsel. Nor did he consult counsel. During his meeting with federal officials on Monday, November 5, 2012, General Cartwright corrected the record and corrected his misstatements from the previous day. The charge against General Cartwright does not include any statement he made on November 5, 2012.

## III.    RELATED CONDUCT

<u>Saving-the-Secrets</u>

General Cartwright's decision to meet with journalists David Sanger and Daniel Klaidman was consistent with a process that is well-known, well-established, and well-respected among senior members of the national security and journalistic communities.  When a news organization or publishing house is preparing to publish a story containing sensitive national security information, it is frequently the case that one or more high-ranking government officials will meet with the journalist responsible for the story, with the editor, or with both.  The purpose of the meeting is to give government officials the opportunity to point out ways that disclosing classified information in the story can jeopardize American lives or do damage to national security.  The officials' purpose in participating in such a process is, if warranted, to persuade the journalist to modify the reporting.  This "save-the-secrets" process is neither unusual nor infrequent.  The willingness of journalists to participate in the process is a crucial safeguard for the national security interests of the United States.

The former Executive Editor of the *Washington Post*, Leonard Downie Jr., has submitted a document to the Court describing this process.  *See* Ex. 1.  He explains that, for decades, it has been "common practice" for reporters and editors at the *Washington Post* and other publications to participate in these discussions with senior officials.  *Id.* at 1.  The off-the-record conversations necessarily involve discussions of classified information -- and in some cases classified documents -- that the journalists have obtained from other sources.  The process may be extensive.  It sometimes involves agency heads.  On some occasions, it has involved the President of the United States.  Mr. Downie describes numerous instances when news organizations delayed stories or deleted certain information after being convinced -- in save-the-secrets exercises -- that publication would risk serious harm to national security.  *Id.* at 2-3.

Without this process, journalists would be less able to identify such risks, and U.S. national security could be gravely harmed.

The joint letter from current and former senior government officials also makes reference to this process.  *See* Ex. 5.  The officials note that, from their perspective, the process poses a difficult and complex challenge of trying to shape journalists' stories to avoid materially harmful disclosures and to minimize damage that their stories might do to U.S. security interests.  In Sanger's book, *Confront and Conceal*, which he discusses in his letter to the Court with regard to the events in this case, Sanger makes explicit reference to the fact that he engaged in this process with senior administration officials.[1]

General Cartwright's Past Involvement

In the course of General Cartwright's military career and in service to two different Presidents, he had previously engaged in these save-the-secrets exercises.  He believes that, by doing so, he has been able to persuade journalists to delay or withhold publication of damaging classified information.  He has engaged in this process at the request of senior officials in the George W. Bush administration as well as in the Barack Obama administration.

As General James Jones explains, General Cartwright was personally involved in the save-the-secrets process during his service as a senior government official.  For example, when the *Washington Post* intended to publish an article by reporter Bob Woodward based on a classified report prepared by General Stanley McChrystal, General Cartwright met with Woodward and *Washington Post* editor Marcus Brauchli to persuade them to change the

---

[1] Mr. Sanger wrote:  "Following the practice of the *Times* in reporting on national security, I discussed with senior government officials the potential risks of publication of sensitive information that touches ongoing intelligence operations.  At the government's request, and in consultation with editors, I withheld a limited number of details that senior government officials said could jeopardize current or planned operations."  David E. Sanger, Confront and Conceal 436 (2012).

reporting to protect national security interests. *See* Ex. 2 (Jones Submission). General Cartwright was successful in doing so: the *Post* withheld from publication certain details that could have compromised future operations. *See* Ex. 1; *see also* Bob Woodward, *McChrystal: More Forces or 'Mission Failure,'* Wash. Post, Sept. 21, 2009.

When General Cartwright left government service in 2012, President Obama made clear to him that the White House wanted to continue to have General Cartwright work with them in his retirement. General Cartwright told the President that he was willing to assist the President in any way he could. President Obama said, "That's what we want." The President explained that he was not sure what form this assistance would take in the future, but that he and his staff would continue to be involved in many programs General Cartwright had worked on and wanted to be able to call on General Cartwright's services even from his position in the private sector. The President told General Cartwright that he wanted "you to be able to call me and me to be able to call you."

General Cartwright left the meeting with the clear expectation that the White House staff would reach out to him for help in various activities. And they have done so. Since General Cartwright's retirement, the White House has asked for General Cartwright's assistance in a number of projects involving the national security interests of the United States. In May 2013, for example, General Cartwright was invited -- with former Senator Sam Nunn and former National Security Advisor Brent Scowcroft -- to brief the President and Vice President on how to reduce the global threat posed by nuclear weapons.[2]

General Cartwright's Contacts with David Sanger and Daniel Klaidman

---

[2] Attached as Exhibit 9 is a photograph taken by the official White House photographer during that meeting. A handwritten note from President Obama appears on the photo thanking General Cartwright for his "continuing contribution to the nation's security."

When journalists David Sanger and Daniel Klaidman contacted General Cartwright to discuss the subjects they were about to report on, both reporters referred to senior members of the White House staff with whom they had spoken.[3]  General Cartwright believed that White House staff had referred the journalists to him as part of the well-established save-the-secrets process.  David Sanger made explicit reference to the fact that senior White House officials had encouraged him to consult with General Cartwright, and Daniel Klaidman also made clear in his communications with General Cartwright that he was in touch with the White House.  That fact is reflected in the emails that Cartwright exchanged with the two journalists.

When the journalists communicated with General Cartwright, it was clear to General Cartwright that the journalists had already interviewed widely among senior U.S. government officials -- and had consulted many other sources.  At the time the journalists met with Cartwright, they were already in possession of significant information -- both classified and unclassified.  It is also clear that, with respect to both journalists, much of their writing had been finalized long before they spoke with General Cartwright.  *See* Ex. 3 (Sanger letter) ("I had spoken to many sources in the United States, Israel, Europe, and elsewhere prior to speaking to Gen. Cartwright, and I already had a detailed understanding of the chain of events.  I was nearing the end of my research and had written much of the book when I approached the White House for final interviews.  There, I was advised to reach out to Gen. Cartwright for an interview."); Ex. 4 (Klaidman letter) (Klaidman notes he had a draft prepared when he contacted General Cartwright and that, in his response to Klaidman, "General Cartwright did not provide any new

---

[3] Both journalists have submitted letters describing to the Court their interactions with General Cartwright.  *See* Ex. 3; Ex. 4.

facts and did not provide any documents.").[4]

General Cartwright expressed concern about Sanger's plan to write about certain subjects the disclosure of which would put lives in jeopardy and do serious harm to U.S. national security interests in the region. General Cartwright was successful in persuading Sanger to modify his reporting to protect American secrets. The same "save-the-secrets" dynamic occurred in General Cartwright's communications with Klaidman. *See* Ex. 3 (Sanger letter) (General Cartwright "ma[de] it clear he had sharp limits on what he could discuss" with Sanger and, during their conversation, "expressed concern that certain classified information not be revealed," which "cautions weighed heavily in decisions that [Sanger] made, in consultation with editors, about what information to withhold from publication"); Ex. 4 (Klaidman letter) (Klaidman contacted General Cartwright "in the event there were any government concerns General Cartwright could anticipate").

In sum, General Cartwright did not initiate contact with either journalist, nor did he ever

---

[4] In *Confront and Conceal,* David Sanger expresses his gratitude to officials in the White House, in the State Department and at the Central Intelligence Agency for the access that they gave to him during his news gathering. Sanger stated that the officials with whom he spoke "are too numerous to name and several would be horrified or fired if I named them here." Sanger, *supra*, at 432.

Sanger expressly thanked Deputy National Security Advisor Ben Rhodes for "setting up interviews at all levels of the White House Staff" and noted that: "Almost every senior member of the president's national security team was generous enough to sit down and talk through their experiences, some more than once." *Id.*

According to documents obtained pursuant to Freedom of Information Act (FOIA) requests, Sanger also carried on an extensive email correspondence with Assistant Secretary of State for Public Affairs Mike Hammer that reflects the degree to which senior officials in that Department cooperated with Mr. Sanger's journalistic efforts. Sanger interviewed Secretary of State Clinton, Deputy Secretary of State Bill Burns, Legal Advisor Harold Koh, Secretary Clinton's top policy advisor and Director of Policy Planning, Jake Sullivan, and many other senior officials including Assistant Secretaries Kurt Campbell and Robert Einhorn. *See* Freedom Watch, http://www.freedomwatchusa.org/pdf/130805-Hillary.pdf.

Mr. Sanger had similar access at the CIA and expressly thanked a senior public affairs official for assistance in arranging meetings at all levels of the Agency, *see id.*, which included an extensive correspondence with the Deputy Director, *see* J.K. Trotter, *Emails: CIA Official Reviewed Parts of* Times *Reporter's Book Before Publication*, Gizmodo (Nov. 22, 2016, 12:50 PM), http://gizmodo.com/emails-cia-official-reviewed-parts-of-times-reporter-s-1788697631.

offer to obtain information for them.  Both Sanger and Klaidman invoked senior members of the White House staff in their communications with General Cartwright.  In agreeing to meet, General Cartwright's primary motivation was to dissuade the journalists from publishing highly sensitive national secrets.  His conduct was consistent with that understanding, and he believes that his efforts were, at least in part, successful.

## IV.     THE SENTENCE

The Court is asked to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of punishment as set forth in 18 U.S.C. § 3553(a)(2).  In imposing sentence, the Court is to consider the kinds of sentences available, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities.  *See id.* § 3553(a).

The Sentencing Guidelines

The parties here agree, and the Probation Office concurs, that the applicable range under the sentencing guidelines is zero months to six months' imprisonment, based on a total offense level of 6 and a criminal history category of I.  Plea Agreement at 3; PSR ¶¶ 85-86.  The parties also agree that the applicable guideline fine range is $500 to $5,000.  Plea Agreement at 3; PSR ¶ 89.  By statute, a term of probation not less than one year and not greater than five years must be imposed.  PSR ¶ 95; 18 U.S.C. § 3561(c)(1).

In this case, the Probation Office has identified no factors warranting a variance from the applicable Guidelines range based on the factors specified in 18 U.S.C. § 3553(a).  PSR ¶ 105.

Probation

A sentence of probation with a condition of community service, consistent with the relevant statute and applicable Guidelines, is appropriate and adequate to serve the purposes of

18 U.S.C. § 3553(a). A probationary sentence, while less severe than a custodial sentence, nevertheless represents a serious reprimand and imposes substantial restrictions on liberty. *See Gall v. United States*, 552 US 38, 48 (2007). A sentence of probation is perfectly consistent with the applicable Guidelines range and would satisfy the § 3553(a)(2) purposes of punishment while also justly and fairly recognizing General Cartwright's lifetime of extraordinary service and good character. We respectfully submit that it is unnecessary and would be unjust to sentence General Cartwright to prison, and request that the Court instead impose a probation-and-community-service sentence.

<u>Punishment and Deterrence</u>

General Cartwright already has faced significant personal and financial repercussions as a result of his guilty plea. For the rest of his life, he will carry the personal shame and reputational stain of a federal felony conviction. The emotional and financial costs of his public humiliation, heightened substantially by the case's high profile, have had a profound effect on him. These burdens also have been increased significantly by the time that it took for the government's investigation to conclude. It has been more than four years since the FBI interviewed General Cartwright, and this case has already cast a long shadow over his life and career. In many respects, General Cartwright has -- even without a conviction -- been seriously burdened by the existence of this investigation.[5]

---

[5] It is notable that the lengthy investigation has included extensive publicity about General Cartwright, and (ironically in a matter concerning a claim of unauthorized disclosure of information) leaks from unnamed government officials about his status. *See, e.g.*, Greg Miller & Sari Horwitz, *Justice Dept. Targets General in Leak Probe*, Wash. Post, June 27, 2013, https://www.washingtonpost.com/world/national-security/justice-dept-targets-general-in-leak-probe/2013/06/27/9ad8bc4e-df7c-11e2-b2d4-ea6d8f477a01_story.html; Ellen Nakashima & Adam Goldman, *Leak Investigation Stalls Amid Fears of Confirming U.S.-Israel Operation*, Wash. Post, Mar. 10, 2015, https://www.washingtonpost.com/world/national-security/leak-investigation-stalls-amid-fears-of-confirming-joint-us-israel-operation/2015/03/10/2a348b1e-c36c-11e4-9ec2-b418f57a4a99_story.html.

The adverse consequences were of course magnified after his guilty plea.  He lost his security clearance and, as detailed in the PSR, General Cartwright has had to withdraw from numerous professional activities.  He has been forced to give up substantial income.  He also has delayed or abandoned other fulfilling personal and professional activities as he awaits the resolution of his case.

Incarcerating General Cartwright is not needed to promote respect for the law.  Nor is it needed to afford adequate deterrence.  The enormous consequences to General Cartwright of this prosecution and his very public fall from grace already have been more than sufficient to warn others to be truthful in speaking with federal investigators.

The Nature and Circumstances of the Offense and the History and Character of the Defendant

As noted elsewhere in this Sentencing Memorandum, without minimizing General Cartwright's misconduct on November 2, 2012, it bears emphasis that General Cartwright returned to continue his interview on the next business day and corrected the record, *see supra* Part III, and that in his discussions with journalists that were the subject of the interview, General Cartwright made efforts to save secrets, not to disclose them, *see supra* Part IV.  Furthermore, the history and character of General Cartwright, a patriot with forty years of distinguished military service, clearly weighs in favor of a non-custodial sentence.  *See infra* Parts V, VI.  A sentence of probation with community service is just and appropriate under the circumstances of this case.

The Need to Avoid Unwarranted Sentencing Disparities

In the two cases most analogous to this one, the defendants were not sentenced to incarceration.  Moreover, in each case, the defendant was allowed to plead guilty to a misdemeanor -- and received a non-custodial sentence -- despite having acted with greater

culpability than General Cartwright's culpability in this case.

General David Petraeus pled guilty in June 2015 to one count of violating 18 U.S.C. § 1924.  It was undisputed at sentencing that General Petraeus had knowingly and deliberately made false statements to federal investigators.  *See* Factual Basis ¶¶ 28, 32-33, *United States v. Petraeus*, No. 3:15-cr-47 (W.D.N.C. Mar. 3, 2015).  Unlike General Cartwright, General Petraeus disclosed classified information intentionally and for no public purpose.  General Petraeus gave his biographer eight black notebooks filled with classified documents and information, telling her "there's code word stuff in there."  *Id.* ¶ 22.  Despite these facts, General Petraeus was permitted to plead to a misdemeanor and was not sentenced to prison, receiving instead two years' probation (with no element of community service) and a fine.

The prosecution of National Security Advisor Sandy Berger is also instructive. He pled guilty to violating 18 U.S.C. § 1924 by unlawfully removing classified documents and handwritten notes -- some of which he destroyed -- from the National Archives on two occasions.  Factual Basis for Plea ¶¶ 3-4, *United States v. Berger*, No. 1:05-mj-175 (D.D.C. Apr. 1, 2005).  When contacted by the National Archives and Records Administration about the missing documents, Mr. Berger did not disclose that he had removed the documents and later made false statements about them.  *Id.* ¶ 6.  Like General Cartwright, however, Mr. Berger later corrected his false statement to the government and accepted responsibility.  *See id.*; Sentencing Memorandum, *Berger*, at 17.  He was sentenced to two years' probation, 100 hours of community service, a fine, and a three-year prohibition on access to classified material.

The sentences in these two cases support the conclusion suggested by the applicable Guidelines range, the nature of the offense, and the characteristics and history of the defendant: that the purposes of punishment do not require, nor are they served by, imprisoning General

Cartwright.  Incarcerating General Cartwright would create a discrepancy in treatment that is hard to explain and impossible to justify.  While any of these three defendants could have been charged with violating § 1001, only General Cartwright could not be charged with violating § 1924 because he did not remove or retain any classified documents.  General Cartwright should not be made to suffer *harsher* punishment than the other defendants because he did less than they did.  The discrepancy in treatment between these defendants would not serve the interests of justice.

<u>Community Service</u>

General Cartwright proposes that, as a condition of his probation, he should be required to complete 600 hours of community service.  While he is, of course, willing to participate in any community service program that the Court or the Probation Office finds appropriate, he suggests that his expertise in technology and cyber issues could be useful to the District of Columbia Public Schools and their efforts to prepare students for technology-related careers.  In light of General Cartwright's service to the country, such a sentence -- involving a community service component that is, to counsel's knowledge, far more extensive than any previously imposed in any analogous case -- would be just and appropriate.

General Cartwright is eager to continue serving the country he loves and will accept any term of community service the Court decides to impose.  He suggests in particular that, if the Court deems it appropriate and if the D.C. Public Schools administration agrees, he could support local schools by offering his expertise and advice regarding information technology. Unsurprisingly, in today's day and age, technology is an important focus of instruction and career training.  The District has established a Career Academy Network, a public-private collaboration that focuses on creating a pipeline of college- and career-ready students able to

compete for skilled jobs, which requires the help of knowledgeable professionals. *See, e.g., DC Career Academy Network (DC Can)*, http://osse.dc.gov/dccan. General Cartwright, formerly the military's leading expert on cybersecurity and technology, would have much to offer to the District's programming in these respects and is eager to contribute. With a significant commitment of hours, he could use his considerable skills to help bring technology to D.C. high school students and prepare them for a work force increasingly dependent on it, while also advising them on how to pursue careers in related fields. The defense submits that a sentence which facilitates these efforts would be, in this case, more just and more appropriate than imprisoning this distinguished and accomplished public servant.

## V.     GENERAL CARTWRIGHT'S PERSONAL BACKGROUND AND MILITARY RECORD

General Cartwright's exceptional record of distinguished public service, his good character, and his sterling reputation as a citizen are of relevance to this proceeding. *See, e.g.*, *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) ("[T]he punishment should fit the offender and not merely the crime."); *Koon v. United States*, 518 U.S. 81, 113 (1996) ("uniform and constant" tradition in federal criminal proceedings "for the sentencing judge to consider every convicted person as an individual"). The 20-page Presentence Report describes General Cartwright's military record, governmental service, and personal background in detail.

Personal Background

General Cartwright was born and raised in Rockford, Illinois. He and his five younger sisters were raised by their father, a salesman, and their mother, a homemaker. General Cartwright was a responsible and hardworking student-athlete. He earned a swimming scholarship that enabled him to put himself through college at the University of Iowa. He enlisted in the U.S. Marine Corps as a reservist shortly after graduating, and was commissioned a

second lieutenant in 1971.

General Cartwright entered active Marine Corps service in 1974 and proceeded to serve as a general officer for 13 years and a pilot for 23 years.  He was assigned to command Marine aviation logistics squadrons, fighter attack squadrons, and aircraft groups.  In 2000, he became Commanding General of the First Marine Aircraft Wing in Okinawa, Japan.  Subsequently, he served as Director for Force Structure, Resources and Assessment (J-8) for the Joint Chiefs of Staff from 2002 until 2004, when he was promoted to the rank of four-star General and became the first Marine Corps officer to lead U.S. Strategic Command (STRATCOM).  He became the Vice Chairman of the Joint Chiefs of Staff in 2007 and served in that role until 2011, when he retired with an honorable discharge.

Record of Military Service

During his forty years of military service, culminating in his service as a four-star General in the United States Marine Corps and Vice Chairman of the Joint Chiefs of Staff, General Cartwright was stationed in posts all over the country and around the world.  As set out in paragraph 53 of the Presentence Report, General Cartwright served in 21 different locations in 11 states, Washington, D.C. and abroad.  Like many service members, General Cartwright was steadfast and diligent in his service to the United States regardless of the strain it placed on himself and his family.

After many years as an officer and a pilot, General Cartwright was promoted to top military positions at a pivotal and challenging time in American history.  He more than rose to the occasion.  His leadership has been credited with "the integration of technologies that enabled, as an example, the destruction of a failing satellite by a missile for the first time, and the successful and historic raid against Osama bin Laden."  *Honoring Vice Chairman of the Joint*

*Chiefs of Staff*, 112th Cong. E1481 (2011) (statement of Hon. Adam Smith).  General Cartwright led the development of the Pentagon's cyber capabilities and expedited the delivery of new technologies to troops in the field, including Mine Resistant Ambush Protected (MRAP) vehicles which resulted in a fifty percent decrease in deaths from IED attacks.  *Id.*  Mary Clark Forbes, a former colleague of General Cartwright who witnessed up close how he made crucial protections available to the everyday soldier, writes that her son, an army officer who served in Iraq, "came home partly due to General James Cartwright."  Ex. 7.

In recognition of these immense accomplishments, General Cartwright has received numerous decorations and awards, as set out in paragraph 68 of the PSR.  For example, he is a multiple-time recipient of both the Defense Distinguished Service Medal, for exceptionally distinguished performance of duty contributing to the national security or defense of the United States -- the highest non-combat-related U.S. military award -- and the Legion of Merit, for exceptionally meritorious conduct in the performance of outstanding services and achievements.

## VI.    LETTERS OF SUPPORT

It is particularly noteworthy -- in a case such as this one with unusual national security dimensions to it -- that so many of the letters of support for General Cartwright come from individuals with deep leadership experience in national security affairs: a former Secretary of Defense; two former Deputy Secretaries of State; three former Deputy Secretaries of Defense; two former National Security Advisors to two different Presidents; former senior officials at the Departments of State, Defense, Treasury and Homeland Security; the current Secretary of the Navy Ray Mabus.  It is inconceivable that such individuals would support anyone whose loyalty or service to the United States of America was in any way questionable.  They have no doubt about the quality and character of James Cartwright.

It is of equal significance that congressional leaders with substantial experience in national security affairs have also written letters in support of General Cartwright: former Chair of the Senate Intelligence Committee Senator Dianne Feinstein; former Chair of the Armed Services Committee Senator Sam Nunn; former ranking member of the Intelligence Committee Representative Jane Harman; and former Representative and Under Secretary of State for Arms Control and International Security Ellen Tauscher.

Experienced and knowledgeable leaders from the private sector and the academic world have also come forward to express their support for General Cartwright: Professor Graham Allison (Founding Dean of the Kennedy School of Government at Harvard; current Director of the Belfer Center for Science and International Affairs); Susan Eisenhower (CEO and Chairman of the Eisenhower Group); David McAllister-Wilson (President of Wesley Theological Seminary); Thomas Kennedy (Chairman and CEO of Raytheon); Mary Howell (CEO of Howell Strategy Group and director of Atlantic Council); Robert Beauchamp (Chairman and CEO of BMC Software and director of Raytheon); Ronald Skates (former director of Raytheon); and William Spivey (director of Raytheon).  Former military officers Frederick Graefe and David Max Korzen, who know General Cartwright well, have also written letters in support of him.

Perhaps most impressive is the testimony of current and former military officials who served with General Cartwright:  Fred Allen, Angela Bruce, Charlie Croom, Jane Dalton, Mary Clark Forbes, Letitia Long, and Richard Scott Stapp.

We commend these letters to the Court in the belief that, along with General Cartwright's service record, they are compelling evidence showing that General Cartwright -- as a man, a citizen and a public servant -- is worthy of a non-custodial sentence.

## VII.    CONCLUSION

General Cartwright does not minimize the gravity of his conduct.  He has already faced

serious consequences as a result of his mistake that day, and he will surely face more.  But there

is no sound reason to send James Cartwright to jail.  With greatest respect, we urge this Court to

impose a sentence of probation and that General Cartwright be required to perform extensive

community service.  That would be the right result.


DATED:  January 10, 2017


SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP


/s/ Gregory B. Craig
Gregory B. Craig
   D.C. Bar No. 164640
Clifford M. Sloan
   D.C. Bar No. 417339
Brendan B. Gants
   D.C. Bar No. 1031419
1440 New York Avenue, N.W.
Washington, DC  20005
T: 202-371-7000
F: 202-393-5760
Email:  gregory.craig@skadden.com
Email: clifford.sloan@skadden.com
Email: brendan.gants@skadden.com

*Attorneys for Defendant*
JAMES E. CARTWRIGHT